Steve W. Berman, WSBA #12536
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292

Christopher Lovell
Christopher J. Gray
LOVELL STEWART HALEBIAN LLP
500 Fifth Avenue
New York, NY 10110
(212) 608-1900

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SEP 27 2002

JAMES R. LARSEN, CLERK
_____ DEPUTY
SPOKANE, WASHINGTON

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

RONALD R. WAMBOLT, on behalf of
himself and all others similarly situated,

                Plaintiff,

    v.

AVISTA CORP., THOMAS M.
MATTHEWS, GARY ELY and JON E.
ELIASSEN,

                Defendants.

No. CS-02-0328-FVS

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS

JURY TRIAL DEMANDED

      Plaintiff, by his undersigned attorneys, individually and on behalf of the Class

described below, upon information and belief, based upon, *inter alia*, the investigation

of counsel, which includes, among other things, a review of public announcements

made by defendants, Securities and Exchange Commission ("SEC") filings made by

defendants, press releases, reports of securities analysts, and media reports, except as

to the paragraph applicable to the named plaintiffs which is alleged upon personal

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES
LAWS

    - 1 -

1643.10 0001 BSC.DOC

HAGENS BERMAN LLP
*Attorneys at Law*

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

ORIGINAL

knowledge, brings this complaint (the "Complaint") against defendants named herein, and alleges as follows:

## SUMMARY OF ALLEGATIONS

1.       This is a securities class action alleging violations of the federal securities laws and in connection with misstatements and omissions of material fact regarding Avista Corp. ("Avista" or the "Company") by the defendants named herein. In particular, during the class period hereinafter defined, defendants omitted to disclose the following crucial facts regarding risky business practices that Avista was engaging in with Enron Power Marketing Inc. (hereinafter "Enron") and its subsidiary, Pacific General Electric Co. (PG&E"), including:

- That Avista was engaged in highly risky energy trading activities with Enron and PG&E involving so-called "Ricochet" or "megawatt laundering" trades in which Avista acted as a middleman between Enron and PG&E so that Enron could evade California's caps on electric power prices and charge California artificially high prices for electricity;

- That Avista routinely acted as a middleman between affiliates such as Enron and PG&E in order to facilitate transactions to proceed which would have been prohibited under federal rules if the affiliates had engaged in them without an intermediary;

- That Avista's reported revenues from its energy trading and wholesale purchase and sale of electric power during the Class Period were not sustainable because they were derived in part from Avista's role in "Ricochet" transactions and other Enron trading schemes that had no economic purpose other than to "game" the California power market; and

- That Avista was and is exposed to substantial contingent legal liabilities as a result of the foregoing, including the threatened  revocation of its

CLASS ACTION COMPLAINT FOR          - 2 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS



BOSTON  LOS ANGELES  PHOENIX  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

license to trade electric power on the wholesale markets, or market-based rate authority, by the Federal Energy Regulatory Commission ("FERC" or the "Commission").

2.     When Wall Street began to learn the truth regarding the foregoing on June 5, 2002 after FERC issued an order finding that Avista had failed to cooperate with FERC's investigation into manipulation of the California power markets during 2000 and ordered Avista to show cause why its authority to sell electric power at market-based rates should not be revoked as a result of Avista's failure to comply with the Commission-ordered investigation, Avista's stock tumbled 13 percent.  On August 14, 2002, after the Commission announced that it may take formal enforcement action on charges that Avista helped manipulate California power prices during 2000, Avista stock tumbled 11.85 percent, and on September 17, 2002 Avista stock traded at as low as $11.10 per share, down from its class period high of *$67.55*.

## JURISDICTION

3.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Plaintiff brings this action pursuant to Sections 10(b) and 20(a) of the Exchange Act as amended (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and the common law.  Venue is proper in this District because defendant Avista conducts business and maintains its primary place of business in this District, and because certain of the wrongful acts alleged herein took place or originated in this District.

5.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including,

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES
LAWS

- 3 -

HAGENS BERMAN LLP
*Attorneys at Law*

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Ronald R. Wambolt ("Plaintiff") purchased shares of Avista at artificially inflated prices as set forth on Schedule "A" hereto and was damaged thereby.

7.     Defendant Avista Corporation, an energy company involved in the generation, transmission and distribution of energy, as well as other energy-related businesses, is a Washington corporation having its principal place of business at 1411 East Mission Avenue, Spokane, Washington.  The Company's stock trades in an efficient market on the New York Stock Exchange under the symbol "AVA".

8.     Defendant Thomas M. Matthews formerly served at times relevant hereto as Avista's Chairman and Chief Executive Officer before resigning in November 2000.

9.     Defendants Gary Ely and Jon E. Eliassen currently serve as Avista's Chairman, Chief Executive Officer and Chief Financial Officer, respectively. Defendants Matthews, Ely and Eliassen are hereinafter sometimes collectively referred to as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

10.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased, converted, exchanged or otherwise acquired the common stock of Avista  between November 23, 1999 and August 13, 2002, inclusive (the "Class Period") and were damaged thereby (the "Class").

HAGENS BERMAN LLP
*Attorneys at Law*

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

11.    Members of the Class are so numerous that joinder of all members is impracticable.  Specifically:

(a)    There were 47,682,357 shares of Avista stock issued and outstanding as of March 19, 2002; and

(b)    While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of Class members who acquired Avista stock during the Class Period.

12.    Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff and the other members of the Class have sustained damages because of defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

13.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

14.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES
LAWS

- 5 -



BOSTON  LOS ANGELES  PHOENIX  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

1       (c)    whether defendants participated directly or indirectly in the course

2   of conduct complained of herein; and

3       (d)    whether the members of the Class have sustained damages as a

4   result of defendants' conduct and the proper measure of such damages.

5   **DEFENDANTS' FRAUDULENT COURSE OF CONDUCT**

6   **A.    November 23, 1999-May 8, 2002: Avista Embarks Upon an Undisclosed
7   and Highly Risky Course of Business by Acting As A Middleman In
    "Ricochet" or "Megawatt Laundering" Transactions Involving Enron and
8   PG&E**

9       15.    Avista is an energy company involved in the generation, transmission

10  and distribution of energy, as well as other energy-related businesses.  After joining

11  the company (from Houston-based power trader Dynegy) on July 1, 1998, defendant

12  Matthews tried to transform a sleepy utility company known as The Washington

13  Water Power Company into Avista– a national player in what was thought to be the

14  emerging business of energy trading.   Under Matthews' leadership The Washington

15  Water Power Company opened trading offices in Houston and Boston, slashed its

16  dividend, and changed its name to Avista.  These initiatives proved to be too

17  ambitious, however, and by late-1999 Avista claimed to be retrenching itself as a

18  regional utility company.  The company stated in a November 23, 1999 press release:

19          SPOKANE, WASH: Avista Corp. (NYSE:AVA) affiliate
20          Avista Energy today announced a redirection of its focus
            away from national energy trading toward a more regionally
21          based energy marketing and trading effort backed by
            physical assets. Costs to effect the transition are estimated to
22          be between $10 million and $15 million dollars and will be
            reflected in normal expenses during the next six months.
23          The company is presently evaluating a number of options
            including the sale of a portion of the business. The move
24          toward regionally focused energy-marketing activities
            follows significant changes in the overall energy trading and
25          marketing industry that have created low margins while
26          requiring higher levels of investment, credit commitments

CLASS ACTION COMPLAINT FOR        - 6 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS



HAGENS BERMAN LLP
*Attorneys at Law*

BOSTON  LOS ANGELES  PHOENIX  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

1
2
3

and value-at-risk limits. Mergers and consolidations within the industry have also created a small number of large players and a marketplace where liquidity has decreased and volatility has risen.

4       16.    Thus, as of late-1999 and early-2000, investors were led to believe that

5   Avista was returning to a lower-risk, more conservative business approach in line with

6   its history as a traditional public utility.  Avista summarized its new regional focus as

7   follows in its Annual Report for 1999 filed with the SEC on March 17, 2000 as

8   follows:

9
10
11
12
13
14
15

Regionally. The Company plans to concentrate on growing its telecommunications and fiber optic business as part of its overall strategic focus on generating shareholder value. In addition, the Company plans to add to its regulated and non-regulated energy-related assets on a regional basis as the industry consolidates to further optimize its assets and create greater economies of scale. The growth is expected to be driven by the Company's significant base of knowledge and experience in the operation of physical systems - for both electric energy and natural gas - in the region, as well as its relationship-focused approach to the customer.  [1999 Form 10-K p. 1.]

16

The company modestly described its risk factors as follows:

17
18
19
20
21
22
23
24

The Company's growth strategy exposes it to risks, including risks associated with rapid expansion, challenges in recruiting and retaining qualified personnel, risks associated with acquisitions and joint ventures, and increasing competition. In addition, the energy trading and marketing business exposes the Company to the financial and credit risks associated with commodity trading activities. The Company believes that its extensive experience in the electric and natural gas business, coupled with its strong management team, will allow the Company to effectively manage its further development as a diversified energy, information and technology company.  [1999 10-K p. 1.]

25       17.    Unbeknownst to investors, Avista was about to embark upon a reckless

26   course of business involving highly risky energy trading activities with Enron and



HAGENS BERMAN LLP
Attorneys at Law

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1  PG&E involving so-called "Ricochet" or "megawatt laundering" trades in which

2  Avista acted as a middleman between Enron and PG&E so that Enron could evade

3  California's caps on electric power prices and charge California artificially high prices

4  for electricity.  In such trades Avista routinely acted as a middleman between affiliates

5  such as Enron and PG&E in order to facilitate transactions to proceed which would

6  have been prohibited under federal rules if the affiliates had engaged in them without

7  an intermediary.

8        18.    During the year 2000 an apparent shortage of power wreaked havoc on

9  California's economy, causing occasional unpredicted blackouts and rolling

10  interruptions of power.  At the time, such interruptions in the power supply were

11  attributed to excessive regulation of intrastate power prices by California regulators,

12  insatiable demand from a growing population of Californians, and/or the Clinton

13  Administration's tougher licensing requirements that made it difficult for power

14  companies to build new power plants.  For whatever reason, throughout 2000

15  businesses and consumers in California could not rely on a steady supply of power

16  and instead faced unpredictable periodic blackouts that were both inconvenient and

17  disruptive to business.  According to an estimate by Cal. Senator Joseph Dunn, these

18  disruptions resulted in hundreds of billions of dollars in damage to the California

19  economy.  In addition, power prices in California rose rapidly in late 2000, causing

20  Californians to pay approximately $10 billion in excess electricity charges.

21        19.    However, after the collapse of Enron the public slowly began to find out

22  that, unbeknownst to the market, shortages of power and blackouts in California had

23  not been a result of rampant demand or imprudent regulatory policy.  Instead, it

24  developed, many of the shortages and blackouts were caused by market manipulation

25  and the artificial creation of shortages via schemes designed to exploit weaknesses and

26  loopholes in the California power grid.  Some of the schemes employed by Enron and

CLASS ACTION COMPLAINT FOR      - 8 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS

HAGENS BERMAN LLP
*Attorneys at Law*

BOSTON  LOS ANGELES  PHOENIX  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

1   others to reap supracompetitive profits even took on nicknames, such as "Deathstar"
2   (a generic name for a family of schemes that were designed to capture ISO congestion
3   payments based on imaginary transactions), "Black Widow," "Red Congo," "Cong
4   Catcher," "Bigfoot" and "Fatboy".

5       20.    During the year 2000 Avista engaged in electric power transactions with
6   Enron and PG&E having the characteristics of "Ricochet" trades, in which Enron
7   bought electric power from the California electric grid operator known as the
8   Independent System Operator  (the "ISO") and sold such power to Avista.  Avista
9   then resold the power to PG&E. Next, PG&E sold the power back to Avista, which
10  then resold the power back to Enron.  Enron in turn sold the power back into
11  California, usually to the Los Angeles Department of Water and Power.  This chain of
12  transactions had the effect of enabling Enron to charge California utilities unregulated
13  market prices for power that Enron had in fact bought *in California at much lower,*
14  *capped prices* and improperly pocket the difference between the regulated, capped
15  California prices and unregulated, uncapped market prices.  Such transactions are also
16  known as "megawatt laundering" transactions because, once fungible electric power
17  originating in California has been laundered through-- or sold to and from-- an out-of-
18  state utility, it can be sold back into California at higher, unregulated prices.

19      21.    At no time prior to May 8, 2002 did Avista reveal the conduct alleged in
20  ¶ 19, *supra*, to the public or regulators.

21  **B.    May 8, 2002-August 13, 2002: Avista Misleads the Federal Energy**
22  **Regulatory Commission and the Market By Making Misleading and**
    **Evasive Public Statements and Written Submissions Regarding Its**
23  **Involvement In "Ricochet" Trades**

24      22.    In response to a continuing public outcry arising from lingering
25  suspicions that the California power "crisis" was in reality created by power traders
26  "gaming" the California power markets, on February 13, 2002 the Federal Energy

CLASS ACTION COMPLAINT FOR                          - 9 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS

HAGENS BERMAN LLP
*Attorneys at Law*

BOSTON  LOS ANGELES  PHOENIX  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

Regulatory Commission ("FERC") directed a Staff fact-finding investigation into whether any entity manipulated short-term prices in electric energy or natural gas markets in the West or otherwise exercised undue influence over wholesale prices in the West for the period January 1, 2000 forward.

23.     On May 8, 2002, FERC Staff issued a data request concerning various trading strategies of sellers of wholesale electricity and/or ancillary services in the United States portion of the Western System Coordinating Council during 2000-2001.  The specific trading strategies were those identified in three Enron memoranda that were provided by Enron to the FERC in response to a data request.  Among the sellers to whom the data request was sent were public utilities who were granted market-based rate authority by the FERC based on a finding that they lacked market power and there was no evidence of affiliate abuse or reciprocal dealing (including Avista).

24.     In response to the FERC request, on May 22, 2002 Avista denied any involvement in the types of trades set forth in the data request, stating that an extensive search of Avista's records failed to turn up any pertinent references to trading practices allegedly carried out by Enron traders to manipulate the California market.  Avista proclaimed itself innocent of any wrongdoing in a May 22, 2002 press release:

> SPOKANE, WASH.: Avista Corp. (NYSE:AVA) has affirmed that the past and present trading activities of both its utility and unregulated subsidiary have been carried out in a legitimate and ethical manner. The company has detailed its position in a response to a Federal Energy Regulatory Commission inquiry into trading practices in the California energy market during 2000 and 2001.
>
> "Avista's actions were legitimate, backed by real energy assets and did not violate the ISO tariff or any state or federal regulations," said Gary G. Ely, chairman, president



HAGENS BERMAN LLP
Attorneys at Law

BOSTON  LOS ANGELES  PHOENIX  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1           and chief executive officer of Avista Corp. "Our company's
2           success has been built on decades of experience serving
        customers in the western energy markets."

3       25.    Unbeknownst to Avista, also in response to the FERC request, PG&E

4   identified certain Enron-related transactions responsive to the FERC request which

5   Avista, in a middleman capacity, had facilitated. PG&E also turned over transcripts of

6   trading activity revealing that Avista personnel were involved in "Ricochet"-type

7   transactions.

8       26.    Having learned (based on information provided by PG&E) that Avista

9   had been less than forthcoming in response to the FERC request, on June 4, 2002 the

10  FERC issued an Order finding that Avista and others had failed to cooperate with the

11  FERC investigation and ordered Avista and others to show cause why their authority

12  to charge market-based rates should not be revoked as a result of their failure to

13  comply with the FERC investigation.

14      27.    Avista then backtracked, no longer claiming that it had not been involved

15  in any "Ricochet" trades, but instead claiming that it had not *knowingly* withheld any

16  information about such trades. On June 5, 2002 Avista issued a press release stating

17  as follows:

18          "We have not knowingly withheld any information about
19          Avista Utilities' activities related to FERC's request," said
        Gary G. Ely, chairman, chief executive officer and president
20          of Avista Corp. "We will continue to do everything possible
        to cooperate with FERC in this process to provide a
21          complete and accurate response."

22  In the press release, Avista attributed its failure to identify the questionable

23  transactions identified by PG&E in response to the FERC order to a lack of time to

24  review its records.

25      28.    The market was not convinced that Avista was free of exposure on the

26  Enron front, however. On news of the FERC order to show cause, Avista stock

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES
LAWS

- 11 -



HAGENS BERMAN LLP
Attorneys at Law

BOSTON  LOS ANGELES  PHOENIX  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1  tumbled 13 percent.  Undeterred, Avista continued to stick to its story that it was not

2  involved in any wrongdoing.  On June 14, 2002, Avista responded to the FERC order

3  to show cause, claiming in substance that it had failed to locate the "Ricochet" trades

4  identified by PG&E because, in a letter to Avista, PG&E had not identified any

5  specific trades, but had only provided Avista with the dates on which the trades

6  occurred.  Avista summarized its involvement in the Enron "Ricochet" trades as

7  follows:

8          Certainly, had Avista Utilities been able to review all the
           transcripts, both its own and PGE's, relating to the
9          transactions, prior to the deadline for filing the responses to
           the May 8 Data Request, Avista Utilities would have been in
10         a position to provide an additional explanation of the
           transactions with PGE and Enron in April, May, and June of
11         2000. Nonetheless, a close examination of those transactions
           reveals conclusively that Avista Utilities was not engaged in
12         Ricochet transactions, or any other trading strategy specified
           in the May 8 Data Request. To the extent that any company
13         engaged in a "trading strategy" behind the specified
           transactions, that company was Enron, engaging in the
14         practice identified in the data requests as "Death Star."
15         Avista Utilities, however, was unaware of Enron's intent, did
           not participate in the Cal ISO congestion markets which
16         enable Death Star to work, did not understand the
           transactions to be part of a congestion relief schedule.
17         Instead, Avista Utilities' traders believed they were engaging
           in a standard bilateral, buy/sell transaction with Enron and
18         PGE in an accommodation to maintain good relations with
           two of Avista Utilities' common trading counterparties.
19         [Avista Response to Order to Show Cause, p. 6.]

20

21     29.    Avista maintained that while its traders had been involved in transactions

22  that **Enron** arranged to manipulate the California market, Avista personnel had done

23  so only as the unwitting dupes of Enron:

24         The Avista Utilities transcripts paint the clearest picture of
25         what was actually intended by Avista Utilities. Virtually all
           of the transactions in question involved the purchase of
26         energy by Avista Utilities from Enron at Malin, and then a

CLASS ACTION COMPLAINT FOR          - 12 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS



HAGENS BERMAN LLP
Attorneys at Law

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 Fifth Avenue, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

resale of that same energy to PGE at Malin. The resale to PGE almost always included an add-on of a small buy/sell fee (either $0.25 or $1.00 per MWh) to compensate Avista Utilities for its 13 role in the transactions. The Avista Utilities' transcripts plainly demonstrate that the Avista Utilities traders that consummated the transactions simply believed that they were helping accommodate a transaction between Enron and PGE, a standard industry practice known as a "sleeve". There are many legitimate reasons in a liquid trading market that cause two counterparties to seek out a third party to accommodate a transaction by stepping into the middle with a buy/sell arrangement and to "sleeve" the transaction. The most common reasons relate to internal corporate trading policies and creditworthiness problems. Avista Utilities' traders were simply trying to accommodate two other entities, PGE and Enron, that were common trading partners with Avista Utilities, and to maintain the type of good relations that are important among buyers and sellers in the Pacific Northwest markets.

The transcripts demonstrate further that the transactions were initiated solely by Enron, and that Avista Utilities provided no transmission associated with the transactions nor did it acquire any transmission. Finally, and perhaps most importantly, the transcripts show conclusively that there was no awareness on the part of Avista Utilities' traders about what, if any, strategy Enron was engaged in, the purpose behind the buy/sell requests, how Enron's strategies worked, nor even why Enron and PGE selected Avista Utilities to undertake this buy/sell. It is imperative that the Commission examine the transcripts of Avista Utilities' tape recordings in isolation from the other materials now available in this proceeding (including the transcript materials from PGE of other conversations related to the same transactions). The Avista Utilities transcripts related to the transactions are included in their entirety as Attachment A to this answer, and demonstrate Avista Utilities' limited understanding of these buy/sell transactions with 14 Enron and PGE and the lack of knowledge by Avista Utilities of whatever Enron was doing. They demonstrate that Avista Utilities was not engaged in any of the Enron strategies through these transactions.  [Avista Response to Order to Show Cause, pp. 13-14.]



HAGENS BERMAN LLP
Attorneys at Law

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

30.   The FERC quite simply did not buy Avista's explanation.  On August 13, 2002, FERC issued an Order Initiating Investigation, and Establishing Hearing Procedures and Refund Effective Date.  The FERC commented as follows:

> In its answer to Staff's initial data request of May 8, 2002, concerning various trading strategies, Avista did not admit to involvement in any of the trading strategies.  In response to the Show Cause Order, Avista now admits that, in a middleman capacity, it facilitated certain transactions identified by [PG&E] in [PG&E's] response.…  In fact, Avista states that it routinely acted as a middleman between affiliates such as [Enron affiliate] EPMI and [PG&E] in order to allow transactions to proceed which would be forbidden to undertake directly.…
>
> While admitting that this was part of its standard business practice… Avista made no attempt to go beyond the discrete transactions previously revealed by [PG&E].  Avista argues that, because its tapes cannot be reviewed by electronic search methods, "there was no way for Avista Utilities to conduct any kind of meaningful review of all, or even a portion, of the telephone conversations in its possession and no way to focus such a review."
>
> * * * *
>
> Avista claims that it was "used" unwittingly by Enron.  However, this is not reconcilable with Avista's acknowledged practice of acting as an affiliate go-between as a routine matter.  Nor are we convinced that, without electronic search methods, it is incapable of coming forth with a thorough analysis of its own activities.  This is in share contrast to many other entities that made a considerable effort to provide full and complete responses…

31.   The FERC submitted these conclusions to the U.S. Congress, adding that Avista had been "less than forthcoming."  The market once again reacted drastically.  On August 14, 2002, after the Commission announced that it may take formal enforcement action on charges that Avista helped manipulate California power prices during 2000, Avista stock tumbled 11.85 percent, and on September 17, 2002 Avista

CLASS ACTION COMPLAINT FOR          - 14 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS



HAGENS BERMAN LLP
Attorneys at Law

BOSTON  LOS ANGELES  PHOENIX  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

stock traded at as low as $11.10 per share, down from its class period high of **$67.55.**
FERC summarized the situation as follows: "If the Enron companies, El Paso Electric
or Avista are found to have violated federal law, the commission could revoke their
market-based rate authority... [i]f any of the companies are found to have violated a
FERC rule, regulation, tariff or order, they may be ordered to disgorge any profits
obtained while engaging in the prohibited activities."

## MISSTATEMENTS AND OMISSIONS OF MATERIAL FACTS

32.    During the Class Period hereinafter defined, defendants omitted to
disclose crucial facts regarding risky business practices that Avista was engaging in
with Enron Power Marketing and its subsidiary PG&E, including:

- That Avista was engaged in highly risky energy trading activities with
  Enron and PG&E involving so-called "Ricochet" or "megawatt
  laundering" trades in which Avista acted as a middleman between Enron
  and PG&E so that Enron could evade California's caps on electric power
  prices and charge California artificially high prices for electricity;

- That Avista routinely acted as a middleman between affiliates such as
  Enron and PG&E in order to facilitate transactions to proceed which
  would have been prohibited under federal rules if the affiliates had
  engaged in them without an intermediary;

- That Avista's reported revenues from its energy trading and wholesale
  purchase and sale of electric power during the Class Period were not
  sustainable because they were derived in part from Avista's role in
  "Ricochet" transactions and other Enron trading schemes that had no
  economic purpose other than to "game" the California power market; and

- That Avista was and is exposed to substantial contingent legal liabilities
  as a result of the foregoing, including the threatened revocation of its

CLASS ACTION COMPLAINT FOR                    - 15 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS



HAGENS BERMAN LLP
Attorneys at Law

BOSTON  LOS ANGELES  PHOENIX  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

license to trade electric power on the wholesale markets, or market-based rate authority, by the Federal Energy Regulatory Commission.

In addition, defendants made affirmative statements regarding Avista in its press releases and elsewhere as allege herein which were materially misleading in light of defendants' omissions to state the material facts set forth in this paragraph.

## STATUTORY SAFE HARBOR

33.     The statutory safe harbor provided for forward-looking statements does not apply here as the false statements alleged herein were not forward-looking.

## FRAUD ON THE MARKET

34.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period regarding Avista as alleged herein;

(b)     The omissions and misrepresentations were material;

(c)     During the Class Period, Avista' common stock was traded on a developed national stock exchange, namely the New York Stock Exchange, which is an open and efficient market;

(d)     Avista filed periodic reports with the SEC;

(e)     Avista was followed by securities analysts;

(f)     The market rapidly assimilated information about Avista that was publicly available and communicated by the foregoing means and that information was promptly reflected in the price of Avista' common stock; and

(g)     The misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Avista' common stock.

CLASS ACTION COMPLAINT FOR          - 16 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS



HAGENS BERMAN LLP
Attorneys at Law

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

## **SCIENTER**

35.    The Individual Defendants acted with scienter in that they knew that statements issued and disseminated by Avista were materially false and misleading, or that the statements therein were made and distributed with reckless disregard for facts that Avista either knew or should have known.  The Individual Defendants knew or recklessly disregarded the fact that such misleading statements would be distributed and disseminated to the investing public, and substantially participated in and/or acquiesced in the issuance and dissemination of such statements in violation of the federal securities laws.  Specifically, defendants knew or recklessly disregarded, and omitted to disclose, that Avista was engaging in risky and improper business practices involving "Ricochet" trades.

36.    The Individual Defendants either knew that such statements were false and misleading or acted with reckless disregard of such falsity since, as senior officers of Avista, the Individual Defendants knew (or alternatively had free and unfettered access to materials that would have revealed), *inter alia*, that Avista was engaging in risky and improper business practices.  If the Individual Defendants did not have actual knowledge of the misrepresentations and omissions alleged, then they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover same.

37.    The Individual Defendants also had substantial economic motives to conceal the true facts regarding Avista' accounting, including the following.  By concealing such facts, the Individual Defendants were able to artificially inflate the value of their own substantial holdings in Avista stock.



HAGENS BERMAN LLP
*Attorneys at Law*

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

**AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10B-5 PROMULGATED THEREUNDER**

38.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

39.    During the Class Period, the defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Avista common stock; and (c) cause plaintiff and other members of the Class to purchase Avista stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants took the actions set forth herein.

40.    Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Avista common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued as primary participants in the wrongdoing alleged.

41.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. § 210.01 *et seq.*) and S-K (17 C.F.R. § 229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and business practices so that the market prices



HAGENS BERMAN LLP
*Attorneys at Law*

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    of the Company's publicly traded securities would be based on truthful, complete and

2    accurate information.

3        42.    Defendants, individually and in concert, directly and indirectly, by the

4    use of means or instrumentalities of interstate commerce and/or of the mails, engaged

5    and participated in a continuous course of conduct to conceal adverse material

6    information about Avista and its operations and business practices, as set forth more

7    particularly herein, and engaged in practices and a course of business which operated

8    as a fraud and deceit upon the purchasers of Avista securities during the Class Period.

9        43.    Defendants had actual knowledge of the misrepresentations and

10   omissions of material facts set forth herein, or acted with reckless disregard for the

11   truth in that they failed to ascertain and to disclose such facts, even though such facts

12   were readily available to them.

13       44.    Defendants' material misrepresentations and/or omissions were made

14   knowingly or recklessly and for the purpose and effect of artificially inflating the

15   market price of Avista stock.

16       45.    As a result of the dissemination of the materially false and misleading

17   information and failure to disclose material facts, as set forth above, the market price

18   of Avista' common stock was artificially inflated during the Class Period.  In

19   ignorance of the fact that the market price of Avista shares was artificially inflated,

20   and relying directly or indirectly on the false and misleading statements made by

21   defendants, or upon the integrity of the market in which the securities trade, and/or the

22   absence of material adverse information that was known to or recklessly disregarded

23   by defendants but not disclosed in public statements by the defendants during the

24   Class Period, plaintiff and the other members of the Class acquired Avista common

25   stock during the Class Period at artificially inflated prices and were damaged thereby.

26

CLASS ACTION COMPLAINT FOR                    - 19 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS

HAGENS BERMAN LLP
Attorneys at Law

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

46.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known that the price of Avista shares had been artificially inflated by defendants' actions, plaintiff and other members of the Class would not have purchased or otherwise acquired their Avista securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

47.    By virtue of the foregoing wrongful conduct by defendants, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934**

48.    Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein, including the allegations of *scienter* set forth at ¶¶ 35 through 37, *supra*.

49.    The Individual Defendants acted as controlling persons of Avista within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, and participation in and/or awareness of the Avista' operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Avista, including the wrongful acts alleged herein.

50.    The Individual Defendants, by reason of their high-level positions, were at times relevant hereto the controlling persons of Avista and had the power and influence to cause, and did cause, Avista to engage in the conduct complained of

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES
LAWS

- 20 -



BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1643.10 0001 BSC.DOC

1    herein.  Thus, the Individual Defendants controlled the public dissemination of the

2    false and misleading information alleged herein and were culpable participants in the

3    wrongful conduct alleged herein.

4         51.    In particular, each of the Individual Defendants had, at times relevant

5    hereto, direct and supervisory involvement in the day-to-day operations of Avista and,

6    therefore, is presumed to have had the power to control or influence certain of the

7    particular transactions giving rise to the securities violations  alleged herein, and

8    exercise the same.  Such transactions included, without limitation, Avista' issuance

9    and dissemination of misleading statements and omissions in its public filings with the

10   SEC and otherwise and elsewhere.

11        52.    As set forth above, defendants each violated § 10(b) and Rule 10b-5 by

12   their acts and omissions as alleged in this Complaint.  By virtue of their positions as

13   controlling persons of defendant Avista, the Individual Defendants are liable pursuant

14   to § 20(a) of the Exchange Act.  As a direct and proximate result of defendants'

15   wrongful conduct, plaintiff and the Class suffered damages in connection with their

16   purchases of Avista common stock.

## JURY DEMAND

18        53.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

20        **WHEREFORE**, plaintiff, on behalf of himself and on behalf of the Class,

21   prays for judgment as follows:

22        A.    Declaring this action to be a class action pursuant to Rule 23(a) and

23   (b)(3) of the Federal Rules of Civil Procedure and certifying plaintiff as class

24   representative of the Class and his counsel as class counsel;

25

26

CLASS ACTION COMPLAINT FOR              - 21 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS

1643.10 0001 BSC.DOC



HAGENS BERMAN LLP
*Attorneys at Law*

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    B.    Awarding damages against defendants, jointly and severally, including

2    disgorgement of all unjust enrichment, for damages suffered as a result of defendants'

3    violation of the securities laws;

4    C.    Awarding plaintiff and the Class prejudgment and post-judgment interest,

5    as well as their reasonable attorneys' and expert witnesses' fees and other costs; and,

6    D.    Granting such other and further relief as this Court may deem just and

7    proper.

8    DATED:  September 26, 2002

9                        HAGENS BERMAN LLP

10

11

12    By _____
        Steve W. Berman, WSBA #12536

13      1301 Fifth Avenue, Suite 2900
        Seattle, WA  98101

14      (206) 623-7292

15      Christopher Lovell
        Christopher J. Gray

16      LOVELL STEWART HALEBIAN LLP

17      500 Fifth Avenue
        New York, NY  10110

18      (212) 608-1900

19      Attorneys for Plaintiff

20

21

22

23

24

25

26

CLASS ACTION COMPLAINT FOR                 - 22 -
VIOLATION OF THE FEDERAL SECURITIES
LAWS

1643.10 0001 BSC.DOC

HAGENS BERMAN LLP
Attorneys at Law

BOSTON   LOS ANGELES   PHOENIX   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, __Ronald R. Wambolt_, do hereby certify that:

1.      I have reviewed the complaint regarding Avista, Corp. prepared by Lovell & Stewart, LLP, whom I designate as my counsel in this action for all purposes, and I authorize its filing on my behalf.

2.      I did not acquire or buy the shares of Avista, Corp. common stock that are the subject of the aforesaid Complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3.      I am willing to serve as a representative party on behalf of a class of Avista shareholders, including providing testimony at deposition and trial, if necessary.

4.      I engaged in the following transaction(s) involving Avista shares:

(Fill in as appropriate)

| TRANSACTION (Purchase or sale) | DATE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| A. Purchase | 2/28/00 | 3,000 | 29 3/16 |
| B. Sale | 4/25/00 | 800 | 27.75 |
| C. Sale | 11/20/00 | 2,200 | 22.75 |
| D. | | | |

5.      I am not seeking and have not sought to serve as a representative party on behalf of a class in any other action brought under the federal securities laws that was filed during the three-year period preceding (before) the date of this certification except as indicated below:

(Fill in if you have been or have tried to become lead plaintiff in any other federal securities class actions during the three years before today.  If you have not been a party to any class actions, leave blank.)

3Com, Dec 1998

------------Citrix Systems, Jun 2000
I was not selected in either case.

6.      I will not accept any payment for serving as a representative party on behalf of
the Class beyond my pro rata (based on how much stock I own) share of any recovery,
except such reasonable costs and expenses (if any) that I incur directly relating to the
representation of the Class and my activities in the lawsuit, as ordered or approved by the
Court.

7.      I certify under penalty of perjury that the foregoing is true and correct.

Executed this __16___ day of July 2002.

_Ronald McLamb Jr_ (Signature)
_____ (Title)
__11701 Bella Coola Rd.  (Address)
__Woodway, Wa, 98020_____
_____